UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 20-10136-RGS

UNITED STATES OF AMERICA

v.

TARIK MUHAMMAD

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION TO SUPPRESS

March 17, 2022

STEARNS, D.J.

Defendant Tarik Muhammad is charged with offenses arising from his alleged participation in a drug trafficking conspiracy operating in the greater Boston area. Tarik[1] seeks to suppress physical evidence seized from his person during a warrantless detention and arrest on April 8, 2020, as well as statements he has alleged to have made during the arrest. The court held an evidentiary hearing on November 18, 2021, and heard arguments on the motion on December 2, 2021. Upon careful review of the parties' briefs,

---

[1] Because Tarik and his brother Tabari share the same surname, the court refers to both by their first names for the sake of clarity. The court also refers to Kenji and Hakeem Drayton by their first names, as they too share a surname.

arguments, and the evidence presented at the hearing, the court will deny the motion to suppress.

## BACKGROUND

In November of 2018, federal and state law enforcement officers initiated "Operation Snowfall," an investigation probing persons, including Kenji Drayton, suspected of drug trafficking.  Gov't Ex. A (Compl.) ¶ 8.  As part of the investigation, officers obtained a Title III search warrant permitting them to intercept Kenji's telephone calls.  *Id.*

On April 6, 2020, officers overheard a call between Kenji and an individual known as "Uncle Phil."  Gov't Ex. B (Record of Intercepted Calls) at 3.  During the call, Kenji told Uncle Phil that he had spoken to Hakeem Drayton about his interest in brokering a drug deal on his younger brother's behalf.  *Id.*  Hakeem has two brothers – Tabari Muhammad, his older brother, and Tarik, his younger brother.  Gov't Opp'n (Dkt # 433) at 3.  Uncle Phil warned Kenji to have no dealings with Tarik because he is a "heat master," and that if Kenji caught Tarik "at the wrong time and . . . in the wrong situation," he would "buck right in front of him."  Gov't Ex. B at 3.  At the hearing, Boston Police Detective Gregory Brown testified that he understood Uncle Phil to be warning Kenji that Tarik would come armed to a drug transaction and would be quick to open fire if things became tense.

Hr'g Tr. I (Rough Draft 11/18/21 a.m.) at 26:4-18.  Uncle Phil also informed Kenji that both Tabari and Tarik had recently been acquitted of murder charges but that Tabari was still incarcerated for "beating the police" in prison.  Gov't Ex. B at 4-5.

The next day, Kenji received several phone calls from an unknown male, who would later be identified as Tarik.  *Id.* at 6.  Tarik introduced himself as Hakeem's brother and said to Kenji, "I don't want to say to[o] much but you know, one of these days, you know what I'm saying? When you're available you know what I'm saying? We can definitely sit it down you know and chop it up like that, you know what I'm saying?"  *Id.*  Kenji and Tarik agreed to meet up the following afternoon.  *Id.*  Detective Brown testified that he understood the conversation to mean that Kenji and the male caller – who, at the time, he mistakenly believed to be Tabari – would be meeting to conduct a drug transaction.  Hr'g Tr. I at 36:22-37:12.

At 4:01 p.m. on April 8, 2020, Detective Brown sent pictures of Tabari over WhatsApp to other officers involved in Operation Snowfall, stating:

> Guys this is the guy we believe Kenji is waiting for to come grab the 62 (UM9613).  His name is Tabari Muhammad.  Released on 03/13[/]20 after beating a double gang related Homicide.  He was indicted while incarcerated for the gang assault of the corrections officers in Shirley.  He has an outstanding warrant in the system for that offense.  It may be a clerical error as it's a district warrant.  If it's him we may stop him before he gets back to the Saint Joseph area. Thanks[.]

Def. Ex. 3 (Investigation Report) at 15.  Several officers acknowledged receipt of the message.  *Id.* at 15-16.  Detective Brown testified that "the 62" was a reference to 62 grams of cocaine that officers believed Kenji had in his possession based on prior intercepted calls and surveillance.  Hr'g Tr. I at 42:18-43:6.

At 4:25 p.m., Tarik called Kenji to confirm that the meetup would be next to Tarik's mother's house at 50 Malden Street, which was "around the corner" from Kenji's house at 519 Harrison Avenue.  Gov't Ex. B at 7.  At 4:34 p.m., Tarik called Kenji again and confirmed that he was at his mother's house.  *Id.*  Shortly thereafter, officers witnessed Kenji exit 519 Harrison Avenue and walk towards 50 Malden Street.  Hr'g Tr. I at 45:11-13.  Kenji briefly met with Tarik, who surveillance officers told wireroom investigators looked like Tabari but heavier and with glasses.  *Id.* at 45:3-6, 45:25-46:6. Kenji walked back to 519 Harrison Avenue, entered his home, and emerged a few minutes later, walking back towards Malden Street carrying a water bottle.  *Id.* at 46:7-13, 48:19-21.  In the meantime, Tarik had occupied the front passenger seat of a 2007 silver Volkswagen with tinted windows parked across from 50 Malden Street.  *Id.* at 50:1-5, 83:10-11.

Tarik called Kenji at 4:57 p.m. to tell him that he was in the Volkswagen.  Gov't Ex. B at 7.  Kenji arrived and took the backseat of the car.

Hr'g Tr. I at 50:1-3.  The Volkswagen then drove down Malden Street, made several side street turns, and then dropped Kenji off two minutes later on a street near the corner of Harrison Avenue.  *Id.* at 50:7-12, 23-25.  Boston Police Sergeant Paul Murphy testified that he believed the Volkswagen's route to be "a drive to nowhere" – a common ploy of drug dealers to shake law enforcement surveillance.  *Id.* at 114:5-19.

Shortly after Kenji exited the Volkswagen, law enforcement officers stopped the vehicle and ordered its occupants – Tarik and the vehicle's driver – out at gunpoint.  Def. Ex. 1.1 (Body Camera Video # 1) at 0:38.  Two officers immediately patfrisked the exterior of Tarik's clothing.  *Id.* at 0:41.  The officers then escorted Tarik onto the sidewalk and asked him his name, to which Tarik replied: "Muhammad, Tarik."  *Id.* at 0:57.  At that point, Sergeant Murphy approached Tarik and patted down his outer clothing.  *Id.* at 0:58-1:11.  Sergeant Murphy removed a wallet from Tarik's right pants pocket, *id.* at 1:12, and loose cash from his left pants pocket, *id.* at 1:19-1:25.

Sergeant Murphy then ordered Tarik to "spin," *id.* at 1:38, and lifted the back of Tarik's shirt and sweater, *id.* at 1:41.  He placed his left hand on Tarik's waistband and felt around the area of Tarik's buttocks with his right

hand. *Id.* at 1:47-1:50.[2]   Tarik then attempted to squirm away from Sergeant Murphy's grasp, leaning back and pushing his hips forward. *Id.* at 1:51. Sergeant Murphy testified that he felt a "hard object, inconsistent with human anatomy," at the crease of Tarik's buttocks.  Hr'g Tr. I at 131:24-132:10.

Sergeant Murphy then instructed Tarik to spread his legs.  Tarik raised his left elbow to create some space between himself and Sergeant Murphy and protested: "You can't grab me like that on the fucking middle of the street, bro!" Def. Ex. 1.1 at 1:52-1:55.  In response, several officers physically restrained Tarik, pressed him up against a wall, and placed him in handcuffs. *Id.* at 1:55-2:32.  During the officers' efforts to subdue Tarik, his shirt and sweater were pulled up, revealing a portion of his stomach, *id.* at 2:07-2:08, and his pants were slightly pulled down, exposing the upper part of his buttocks and the band of his underwear, *id.* at 2:33-2:34.  Once Tarik was handcuffed, an officer pulled Tarik's pants back up. *Id.* at 2:51.  He was then placed in the back of an empty police wagon.  Def. Ex. 1.4 (Body Camera

---

[2] In his testimony, Sergeant Murphy stated that he did not reach inside Tarik's pants at any time during the search.  Hr'g Tr. I at 133:3-5.  This assertion is credible and consistent with the court's review of the body camera footage.

Video # 4) at 3:38-3:58.[3]  After Tarik had been driven from the scene, Sergeant Murphy told three remaining officers that he believed Tarik had drugs "shoved up his ass."  Def. Ex. 1.2 (Body Camera Video #2) at 8:58-9:00.

En route to the police station, Boston Officer Thomas Antonino – who was driving the police wagon – noticed from the camera positioned in the rear of the wagon that Tarik was moving around in an agitated manner.  Hr'g Tr. II (Rough Draft 11/18/21 p.m.) at 35:24-36:3, 36:16-18.  Tarik walked to the back of the wagon and threw himself to the floor of the van.  *Id.* at 34:20-24, 36:16-20.  Officer Antonino testified that Tarik was "flopping like a fish." *Id.* at 36:19-20.  He radioed his observations to other officers as the wagon approached the station.  *Id.* at 36:5-9, 21.

When the wagon arrived at the station, Tarik was observed covered with white powder.  He also began spitting a white substance out of his mouth.  Hr'g Tr. I at 145:3-6, 146:17-21; Gov't Exs. M.1-M.2, M.6-M.8. Further, the back of the wagon was dusted with white powder.  Gov't Exs.

---

[3] As Tarik was being searched and arrested, other officers (with the assistance of a K9 dog) searched the Volkswagen.  *See* Def. Ex. 1.2 at 4:51-11:11; Def. Ex. 1.3 (Body Camera Video # 3) at 1:18-3:53; Def. Ex. 1.6 (Body Camera Video # 6) at 1:38-11:27; Def. Ex. 1.7 (Body Camera Video # 7) at 0:09-6:24.  During the search of the vehicle, Boston Officer Patrick Foley noticed a white powdery substance on the driver's side mat and remarked: "Look, he exploded his fucking drugs."  Def. Ex. 1.7 at 1:20-1:23.

M.3-M.5, M.15-M.16, M.18-M.19.  Officer Antonino testified that the interior of the wagon was clean and completely empty at the time Tarik was placed in custody at the scene.  Hr'g Tr. II at 31:22-24, 33:18-34:15.

Officers, concerned that Tarik might have ingested a large amount of cocaine, called for medical assistance.  *Id.* at 39:15-18.  With emergency responders on their way, male officers – including Sergeant Murphy – brought Tarik to a private location within the station and performed a strip search.  Hr'g Tr. I at 147:14-16, 148:1-23.  When Tarik removed his clothes, Sergeant Murphy observed and removed a ripped plastic bag containing white residue that was stuck to the outer cleft of Tarik's buttocks.[4]  *Id.* at 149:2-24.

After the strip search, Boston emergency services personnel brought Tarik to the hospital, where he was eventually discharged.  Because of the COVID-19 pandemic, law enforcement officers released Tarik without formally placing him under arrest.  Hr'g Tr. I at 150:25-151:10.  Tarik was arrested and charged in connection with this case on June 24, 2020.  *See* Dkt # 39.

---

[4] Sergeant Murphy testified that he never placed his hands inside Tarik's anal cavity at any time during this strip search (or, for that matter, at any time during the patfrisk at the scene of the stop).  Hr'g Tr. I at 149:19-24.

## DISCUSSION

The Fourth Amendment prohibits government officials from conducting unreasonable searches and seizures.  U.S. Const. amend. IV.  Accordingly, police officers may not search an individual (or areas over which an individual has a legitimate expectation of privacy) without a warrant unless the search falls under a "certain reasonable exception[]."  *Kentucky v. King*, 563 U.S. 452, 459 (2011).  A search incident to a lawful arrest is one such exception.  *See Riley v. California*, 573 U.S. 373, 382-385 (2014).

*(1) Search Incident to Arrest*

Tarik argues that because the officers did not have probable cause to stop the vehicle and arrest him, the ensuing search of his person incident to arrest was unlawful.  The court is not persuaded.  "[I]f the officer has probable cause to believe that an individual has committed a criminal offense in his presence," the ensuing arrest of that individual is lawful.  *United States v. Flores*, 888 F.3d 537, 543 (1st Cir. 2018).  In executing a lawful arrest, an officer may "search for and seize any evidence on the arrestee's person to prevent its concealment or destruction."  *United States v. Wurie*, 728 F.3d 1, 3 (1st Cir. 2013).  "Probable cause will be found to have been present if the officers at the scene collectively possessed reasonably trustworthy

information sufficient to warrant a prudent policeman in believing that a criminal offense had been or was being committed." *United States v. Tibolt*, 72 F.3d 965, 969 (1st Cir. 1995).[5]   Probable cause requires only a "'fair probability' on which 'reasonable and prudent [people,] not legal technicians, act." *Florida v. Harris*, 568 U.S. 237, 244 (2013) (alteration in original), quoting *Illinois v. Gates*, 462 U.S. 213, 231, 238 (1983).   In justifying the scope of a search incident to arrest, "the prosecution must be able to date the arrest as early as it chooses after the obtaining of probable cause." *Sibron v. New York*, 392 U.S. 40, 77 (1968) (Harlan, J., concurring). Thus, it makes no difference that a search precedes an arrest if probable cause provides the searching officer with grounds for an arrest.   *See Commonwealth v. Brillante*, 399 Mass. 152, 154-155 n.5 (1987).

Here, law enforcement officers had probable cause to stop the Volkswagen and arrest Tarik.  Based on intercepted phone calls, officers were aware that Kenji – a key figure in the drug trafficking operation targeted by Operation Snowfall – and another individual (then believed to be Tabari)

---

[5] The existence of probable cause for an arrest is an issue of law for the court.  "When the constitutional validity of an arrest is challenged, it is the function of a court to determine whether the facts available to the officers at the moment of the arrest would 'warrant a man of reasonable caution in the belief' that an offense has been committed." *Beck v. Ohio,* 379 U.S. 89, 96 (1964) (internal citation omitted).

were planning to meet on the afternoon of April 8, 2020.  Based on previous surveillance of Kenji, Kenji's conversation with Uncle Phil about the brothers, and the male caller's reluctance to explicitly discuss the purpose of the meeting over the phone, Detective Brown reasonably surmised that Kenji and Tabari (Tarik) were meeting to conduct a drug deal.  He transmitted that belief to other officers involved in Operation Snowfall.[6]  Physical surveillance of the interaction between Kenji and Tarik – during which Kenji and Tarik took a brief "ride to nowhere" – reinforced the belief that a drug transaction was taking place.  In the totality of the circumstances, *Gates*, 462 U.S. at 230-231, seen through the lens of the officers' training and experience, *United States v. Arvizu*, 534 U.S. 266, 273-274 (2002), a "prudent policeman" would have reasonably believed that a criminal offense was taking place and that evidence of that offense would be found in the vehicle and on Tarik's person. *Tibolt*, 72 F.3d at 969.  Accordingly, the arresting officers, including Sergeant

---

[6] In making a probable cause determination, courts are guided by the collective knowledge doctrine or "fellow-officer" rule, that is, where police are engaged in a collaborative effort, the individual knowledge of each officer involved may be "pooled" in evaluating the existence of probable cause. *United States v. Cook*, 277 F.3d 82, 86 (1st Cir. 2002).

Murphy, were justified in conducting a search of Tarik's person to prevent the concealment or destruction of any evidence.  *Wurie*, 728 F.3d at 3.[7]

*(2) Alleged "Body Cavity" Searches*

Tarik next contends that he was subjected to "two separate body cavity searches by investigation agents: once at the scene of arrest, and the second at the police station."  Def. Mem. at 16.  Because these searches exceeded permissible constitutional limits, Tarik argues, the fruits of these searches must be suppressed.  *Id.* at 14.  The court disagrees, both with the characterization of the searches as "body cavity searches" and with the contention that the searches that were in fact conducted of Tarik's person were unlawful.

"The reasonable suspicion standard governs strip and visual body cavity searches in the arrestee context."  *Swain v. Sweeney*, 117 F.3d 1, 7 (1st Cir. 1997).  In determining whether an officer's suspicion was reasonable, courts "look at the totality of the circumstances of each case to see whether the detaining officer ha[d] a particularized and objective basis for suspecting

---

[7] Tarik makes much of the fact that law enforcement officers initially (and mistakenly) believed him to be his brother, Tabari.  Def. Mem. (Dkt # 386) at 8-9.  However, given that intercepted calls and physical surveillance established probable cause that the individual – no matter his identity – had engaged in a drug transaction with Kenji, this immaterial mistake of fact does not render the search incident to Tarik's arrest invalid.

legal wrongdoing." *Arvizu*, 534 U.S. at 273.  Moreover, "[t]he suspicion must be specific to the individual being searched."  *United States v. Barnes*, 506 F.3d 58, 62 (1st Cir. 2007).  Because a body cavity search "involves a greater intrusion into personal privacy," a "more particularized suspicion that contraband is concealed" is required.  *Id.*

The initial search incident to arrest at the scene was plainly not a body cavity search.  Based on the body camera evidence and Sergeant Murphy's credible testimony, the search at the scene was appropriately confined to a frisk of Tarik's clothing and the pockets of his pants.[8]  At no point did Sergeant Murphy either physically or visually inspect Tarik's anal cavity. Indeed, the body camera evidence shows that Tarik's pants inadvertently and only partially dislodged during the officers' struggle to restrain Tarik *after* he

---

[8] Where "a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous . . . and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." *Terry v. Ohio*, 392 U.S. 1, 30 (1968).  The frisk may extend beneath a person's outerwear if the officer feels a suspicious object that could be a weapon.  *Id.* at 22-25.  The officers knew from Kenji's conversation with Uncle Phil that at least one of the brothers was reputed to be armed and trigger-happy. Contraband discovered during a protective "frisk" may be seized pursuant to the "plain view" doctrine. *Michigan v. Long*, 463 U.S. 1032, 1050 (1983); *cf. Minnesota v. Dickerson*, 508 U.S. 366, 375-376 (1993) (same, "plain feel").

began to object to Sergeant Murphy's search.  Once Tarik was subdued and handcuffed, an officer immediately pulled Tarik's pants back up fully.

The court further credits Sergeant Murphy's testimony that he felt a hard object inconsistent with human anatomy near the crease of Tarik's buttocks.  This testimony is corroborated by body camera evidence captured only a few minutes later of Sergeant Murphy telling officers that he believed Tarik had drugs "shoved up his ass."  Def. Ex. 1.2 at 8:58-9:00.  Based on the ongoing totality of the circumstances – the apparent drug transaction that had taken place immediately prior to the search, Tarik's evasive behavior when Sergeant Murphy began the frisk, and Sergeant Murphy's feeling of a hard object in Tarik's buttocks area – the officers acquired "a particularized and objective basis for suspecting" that Tarik was concealing drugs and that a strip search in the privacy of the police station was called for.  *Arvizu*, 534 U.S. at 273; *see United States v. Cofield*, 391 F.3d 334, 337 n.2 (1st Cir. 2004) ("It is common knowledge that controlled substances often are concealed on the person of users and dealers alike."); *United States v. Proctor*, 148 F.3d 39, 43 (1st Cir. 1998) (seizure of contraband is appropriate where arresting officer "lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent").  The reasonableness of the officers' suspicion was elevated to a virtual certainty

by Tarik's attempts to ingest the cocaine – and, by extension, to destroy incriminating evidence – the residue of which had been strewn on the floor of the police wagon in which Tarik had been transported.  Finally, the court finds credible Sergeant Murphy's testimony that he and other officers conducted a *strip* search of Tarik at the station, not a manual *body cavity* search.  Sergeant Murphy's assertion that the bag of cocaine was visible to the naked eye and recovered from the outer cleft of Tarik's buttocks is wholly believable, given that Sergeant Murphy had felt what turned out to be the bag of cocaine while frisking Tarik's outer clothing at the scene, and the bag itself had been removed and ripped open, almost certainly by Tarik during his attempt to ingest while in the back of the van.[9]

## ORDER

For the foregoing reasons, Tarik's motion to suppress is <u>DENIED</u>.


SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE

---

[9] That said, Tarik's attempted ingestion of cocaine while inside the police wagon would have provided officers with the "more particularized suspicion" needed to justify a body cavity search.  *Barnes*, 506 F.3d at 62.